UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

YOLANDA WILLIAMS,            )
                            )
            Plaintiff       )
                            )
        v.                  )   Case No. 2:05 cv 319
                            )
JO ANNE B. BARNHART,        )
Commissioner of Social Security )
                            )
            Defendant       )


OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment filed by the plaintiff, Yolanda Williams, on January 30, 2006. For the following reasons, the motion is **GRANTED**.

Background

The plaintiff, Yolanda Williams, initially applied for Supplemental Security Income payments on November 12, 1999, alleging a disability onset date of June 10, 1999. (Tr. 80) The claim was denied initially on April 6, 2000 and upon reconsideration on May 21, 2002. (Tr. 27, 35) Williams requested a hearing before an Administrative Law Judge ("ALJ") on June 6, 2002. (Tr. 33) A hearing before ALJ William Wilkin was held on April 1, 2003, at which vocational expert Thomas Grzesik testified. (Tr. 639) The hearing was continued to November 11, 2003, and included the testimony of medical expert Dr. William Newman and vocational expert Irvin Roth. (Tr. 586) On January 12, 2004, the ALJ denied Williams' application by written decision. (Tr. 22) Following a denial of her request for review by the Appeals Council on March

25, 2005, Williams filed a complaint in this court on May 2, 2005.

Williams was born on January 9, 1966 and is now 40 years old. (Tr. 24) She has an 11th grade education and is the mother of two sons and a daughter. (Tr. 101, 121) From January 1996 until June 1999, Williams worked as a teacher's aid and school bus monitor. (Tr. 104, 626) Both positions, characterized as light and either unskilled or semi-skilled, required Williams to supervise and monitor school-aged children. (Tr. 626)

A series of medical conditions were considered over the course of Williams' application process, including severe pain and numbness in her feet and legs, a herniated a disc, diabetes, morbid obesity, high blood pressure, arthritis, uterine prolapse, urinary incontinence, and depression. (Tr. 116, 120, 123, 350)

In May 1996, Dr. Nicholas Polite examined Williams based upon symptoms that included heavy and painful periods and pro-longed bleeding. (Tr. 351) He diagnosed Williams as having menometrorrhagia, chronic cervicitis, grade III prolapse of the uterus with grade II cystocele, rectocele and enterocele. (Tr. 354) Dr. Polite recommended that Williams undergo a dilation and curettage ("D and C"), which he performed on June 1, 1996. (Tr. 354)

In June 1999, Williams' treating physician, Dr. Young Kim, reported that Williams suffered from a straightening of the lumbar spine consistent with muscle spasms and mild universal

2

bulging of the L4 - L5 intervertebral disc, but without evidence of disc herniation. (Tr. 190, 189) Thereafter, Dr. Kim wrote a note indicating that Williams was being treated for a slipped disc and is "advised to refrain from lifting and excessive walking, standing and climbing stairs." (Tr. 191) Dr. Kim also prescribed a regimen of physical therapy. (Tr. 191)

Williams began physical therapy on June 22, 1999, and reported pain in her back and both legs with an intensity of 9 on a 10-point scale. (Tr. 181) Physical therapist Malgorzata Barnas established a treatment plan that included ultrasound treatment, moist hot packs, other "myofascial modalities," and exercises "if [Williams] can tolerate this intervention." (Tr. 182)

Dr. Kim also referred Williams to Dr. Antonela Svetic, a neurologist who examined Williams in July 1999. (Tr. 210) Dr. Svetic concluded that Williams had "myofascial low back pain syndrome with possible L5 radiculopathy." (Tr. 211) Dr. Svetic also noted that, based upon her levels of pain, Williams refused an EMG. (Tr. 211)

Williams remained under Dr. Svetic's instructions to remain off work and by August 17, 1999 underwent five physical therapy sessions. (Tr. 209, 179)  Barnas reported that Williams demonstrated decreased pain in her legs and back, gained strength, and improved muscle flexibility. (Tr. 179) By the end of August, Barnas reported further progress, and on October 19, 1999, Dr. Svetic wrote that Williams was released to work, but restricted from extensive walking. (Tr. 177, 208) In a letter to Dr. Kim the

3

following day, Dr. Svetic noted, in addition to improvement, new symptoms of frequent numbness in her right arm and left leg. (Tr. 207) Dr. Svetic stated that Williams "has an L5 radiculopathy with possible right C8-T1 verses ulnar neuropathy." (Tr. 207) Dr. Svetic recommended MRIs of both the brain and cervical spine, and an EMG, noting that Williams felt she now could tolerate this procedure. (Tr. 207)

Williams remained under treatment for her diabetes, and in the Disability Report she completed, listed the medicine she took regularly to include amitriptyline, ibuprofen, precose, gluco-trol, cardizem, and atenolol. (Tr. 100) Williams reported that her inability to work was based upon a herniated disc, diabetes, high blood pressure, and pain and numbness in her feet and legs. (Tr. 95)

In November 1999, Williams underwent an ultrasound of the pelvis. (Tr. 193) Dr. Kim noted a mildly enlarged uterus and a cyst of the right ovary. (Tr. 193) In December 1999, an MRI of the lumbar spine continued to show universal bulging of the L4-L5 intervertebral disc but "no evidence of disc herniation." (Tr. 197) Dr. Kim again reported a mild straightening of the lumbar spine but otherwise found the lumbosacral spine within normal limits. (Tr.198) On December 17, 1999, Dr. Svetic issued a letter "to whom it may concern" stating that Williams was to remain off work indefinitely. (Tr. 206)

In December 1999, Williams began an on-going treatment relationship with Dr. Jin Cha to address her uterine prolapse.

4

(Tr. 391) Dr. Cha's notes from December 1999 indicated that
Williams reported bleeding over the past four months and that she
had been without a normal period since the preceding July. (Tr.
378) Following this visit, Dr. Cha prescribed Feosol. (Tr. 278)

Dr. Kanayo K. Odeluga performed a consultative medical exam
of Williams on March 8, 2000. (Tr. 268) Dr. Odeluga, who per-
formed the exam without reference to past medical records, found
that Williams had a limited range of motion in her dorsolumbar
area and concluded that Williams demonstrated "chronic back pains
with radiculopathy most probably due to lumbar disc disease such
as disc herniation," along with mild depression, mild hyperten-
sion, and diabetes mellitus. (Tr. 272, 273)

Dr. J. Pressner completed an administrative Psychiatric
Review Technique on March 20, 2000 and concluded that Williams
did not suffer from any psychiatric disorder. (Tr. 283) According
to Dr. Pressner, Williams did not allege disability due to a
psychiatric disorder, and she had denied any such  problems to an
administration adjudicator. (Tr. 283)  Dr. Pressner also noted
that, with the exception of a medical doctor's indication of
"mild depression," the treatment records did not suggest a
psychiatric disorder. (Tr. 283) A Physical Residual Functional
Capacity Assessment (RFC) indicated that, based upon a mild
decrease in Williams' range of motion and mild universal bulging
of the L4 and L5 disc, she was capable of occasionally lifting 20
pounds, frequently lifting 10, and able to stand and/or walk and
sit for six hours of an eight hour day. (Tr. 275) Williams was

described in the RFC as having stated that her pain had decreased in frequency and intensity, and she was noted as appearing credible. (Tr. 276, 279)

Dr. Svetic referred Williams to Dr. Ramesh P. Kanuru, a pain management specialist, who initially examined Williams on March 28, 2000. (Tr. 304) Dr. Kanuru noted Williams' history of depression, high blood pressure, and arthritis of the knee. (Tr. 304) Dr. Kanuru further stated that Williams is "not able to walk on her heels because of the pain in the right leg" and further described her extremely limited spine flexibility and tenderness in the lumbar area. (Tr. 305)  Dr. Kanuru recommended a treatment plan that included a lumbar epidural steroid injection, and he cautioned Williams that the procedure would be made more difficult, and the risk of complications greater, due to her weight. (Tr. 305-306)

On May 15, 2000, Dr. Svetic stated in a letter addressed "to whom it may concern" that Williams was taking a large amount of pain medications but still was experiencing levels of pain that prevented her from walking for more than 15 minutes. (Tr. 303) Dr. Svetic also noted that Williams would not undergo an epidural treatment due to her weight. (Tr. 303) Dr. Kim wrote in a similar letter four days later that Williams should avoid lifting, climbing, and excessive walking. (Tr. 302) The doctor described Williams as suffering from uncontrolled diabetes, anemia, hypertension, morbid obesity, and a bulging disc at L4-5.(Tr. 302) Dr. Kim noted complaints of dizziness, frequent urination, and

6

blurred vision in addition to the pain in her lower back and right leg. (Tr. 302)

In August 2000, Williams completed an application for reconsideration of the denial of benefits, noting that her back and leg pain had increased and that on occasion her legs "give out" causing her to fall. (Tr. 110) She stated that she no longer was capable of completing routine housework or caring for her children due to constant pain. (Tr. 112) She further stated that she suffered depression when the pain was severe. (Tr. 116) She reported that her children assisted her with shopping, dressing, cleaning, and cooking. (Tr. 118)

Upon Dr. Kim's referral, Williams was examined on September 11, 2000 by neurologist Dr. Andrea J. DeLeo. (Tr. 401) Dr. DeLeo reported that Williams exhibited "a myelopathic process with significant right L4-5 radicular pattern," noting also the possibility of a cervical component. (Tr. 401) Dr. DeLeo sug- gested a course of additional MRIs of the brain and spine as well as EMGs "for the possibility of tarsal tunnel syndrome." An EMG conducted on October 5, 2000 showed normal sensory and motor nerve conduction, however, a series of MRIs revealed a subarach- noid cyst on the right temporal lobe of Williams' brain and mild posterior disc herniation at L4-L5. (Tr. 228, 240, 241) Following these tests, Dr. DeLeo stated that "Ms. Williams exhibits a clinical course and symptom complex consistent with meralgia paresthetica of the right femoral cutaneous nerve. She addition- ally experiences a pain syndrome which is non-specific and might

be related to a generalized anxiety disorder." (Tr. 399) By
December 2000, Dr. DeLeo characterized Williams as having failed
Zanaflex, propoxyphene, and amitriptyline therapy. (Tr. 404) She
"strongly recommended" that Williams be treated at a pain clinic.
(Tr. 404)

In January 2002, Williams began the first of 11 physical
therapy treatments at St. Catherine's Hospital with physical
therapist Angela Castillo-Flores. (Tr. 337) Based upon Williams'
complaints of low back pain, difficulty performing waist level
activities, and inability to walk or stand for long periods,
Castillo-Flores identified a course of therapy that included
moist heat, electrical stimulation, ultrasound, intermittent
traction, and exercises. (Tr. 337, 232) Williams completed this
treatment in April 2002 and was directed to continue a home
exercise program. (Tr. 232)

On April 6, 2002, Dr. Cha admitted Williams to Community
Hospital in Munster, Indiana based upon persistent abnormal
uterine bleeding. (Tr. 387) Dr. Cha related that Williams first
experienced this condition in December of 1999 and was scheduled
to have a dilation and curettage. (Tr. 387) This procedure was
cancelled due to Williams' blood sugar levels. (Tr. 387) Though
Williams had not been seen by Dr. Cha since that time, she
reported that she has experienced bleeding for over two years and
informed Dr. Cha that she was taking oral iron medication for
anemia. (Tr. 387) Dr. Cha found that Williams' uterus was
prolapsed and that she experienced moderate bleeding from the

cervix. (Tr. 387, 382) Dr. Cha prescribed progesterone to reduce the bleeding in preparation for a dilation and curettage which was performed that day. (Tr.382)

In April 2002, Williams completed an administration form regarding her daily activities and in June that year filed a request for reconsideration of the denial of benefits. (Tr. 145-148, 151-154) In both, Williams stated that she was assisted by her mother and children in daily activities such as washing clothes, that she no longer shopped, and that her legs have given out on her, causing her to fall while bathing. (Tr. 147, 151) She stated that she traveled only when necessary to keep a doctor's appointment and could not take public transportation due to the pain when getting on a bus. (Tr. 146, 153)

In July 2002, Williams requested a hearing before an administrative law judge, noting that she was in constant pain and listing eleven medications that she was taking. (Tr. 37, 156) A series of MRIs and a pelvic ultrasound in October 2002 revealed normal conditions regarding her cervical spine, but a mild posterior disc herniation at L4-L5, a mildly enlarged uterus "consistent with adenomyosis," a mild posterior disc bulge at L5-S1, and a subarachnoid cyst on the right temporal lobe of her brain. (Tr. 343, 344, 345, 346, 342) A radiology report from this period also noted a "blunting of calyces of [Williams'] right kidney" causing a "pressure effect" on Williams' urinary bladder. (Tr. 348)

By October of 2002, Williams took a series of medications that included Topamax and Skelaxin for back pain, Metformin, Amaryl, and Avandia for the treatment of diabetes, Cardizen and Atenolol to control blood pressure, and Docusate and Medroxyprogesterone to reduce bladder pressure and cervical bleeding. (Tr. 159-160) Williams also took Wellbutrin for the treatment of depression. (Tr. 159)

The first hearing before ALJ Wilkins was held on April 1, 2003. (Tr. 639) Williams testified that as her condition deteriorated she no longer was able to lift as much as a gallon of milk or get dressed without assistance from her children. (Tr. 664) She stated that her persistent bleeding, while temporarily addressed by progesterone and two dilation and curettage procedures, remained an ongoing problem, causing anemia and related fatigue. (Tr. 686-688, 690) She reported that she had not been able to drive since the prior June, and due to back pain, slept only three hours an evening. (Tr. 666-667) Williams described seven instances since 1999 in which she fell due to the pain in her feet and legs. (Tr. 679) Williams also described frequent loss of memory, which she reported as having occurred over the past two years, and the need to urinate as often as 20 times over the course of a day. (Tr. 684, 690) The ALJ questioned Williams about the prospect of undergoing an hysterectomy in relation to her bladder and bleeding conditions. (Tr. 691) Williams responded that, subsequent to the hearing, she was scheduled to see a gynecologist about this possibility. (Tr. 691)

ALJ Wilkins next questioned vocational expert Thomas Grzesik, who testified that Williams' past work as a teacher's aide and bus aide qualified as light, unskilled work. (Tr. 699) Based on a hypothetical describing an individual limited to light work without repetitive bending, stooping, crawling, or climbing and simple one-two-step work, VE Grzesik concluded that the region contained 6,000 hand packager jobs, 7,000 electrical assembler jobs, and 8,000 mechanical assembler positions. (Tr. 700) The VE found only slight reductions in the available positions when the restriction was limited to sedentary work. (Tr. 701) Upon questioning by Williams' counsel with respect to Williams' need to urinate frequently, VE Grzesik stated that a person who was required to cease working for five minutes once an hour would be terminated. (Tr. 703) The ALJ concluded the hearing, leaving the record open. (Tr. 706)

On April 14, 2003, Dr. K. Arthur completed a residual functional capacity (RFC) questionnaire regarding Williams' bladder condition. (Tr. 472- 476) Dr. Arthur listed Williams' condition as urinary incontinence and found it consistent with the evaluation provided in the RFC. (Tr. 473) Dr. Arthur stated that Williams could not sit or stand for more than 30 minutes at a time, and in an eight-hour day, could not sit or stand/walk for more than two hours total over an eight-hour period. (Tr. 474) Dr. Arthur stated that Williams would require a job that allowed her to shift at will from sitting to standing, permitted ready access to a restroom, and permitted her to take unscheduled

11

restroom breaks. (Tr. 475) Dr. Arthur also indicated that Williams would require the ability to clean up and change clothes once on a daily basis. (Tr. 475)

Williams' treating physician, Dr. Kim, completed a physical RFC that same day. (Tr. 468-471) Dr. Kim's conclusions were consistent with Dr. Arthur's regarding Williams' ability to sit, stand, and walk. (Tr. 469) Dr. Kim added that the length of time Williams could sit, stand, or walk before needing to alternate was five minutes. (Tr. 469) Dr. Kim reported that Williams was unable to twist, stoop, crouch, or climb stairs or ladders. (Tr. 469)

Dr. Suresh Mahawar performed a consultative exam on May 19, 2003. (Tr. 498-506) Aside from noting the difficulty Williams experienced in tandem walking and getting on and off the exam table, Dr. Mahawar noted little that was abnormal in Williams' condition. (Tr. 500) He concluded, "pain magnification behavior noticed during the exam and the degree of disability is not supported by the objective findings." (Tr. 500) He found that Williams was capable of lifting up to 30 pounds occasionally and 20 pounds frequently and that standing, sitting, and walking were not impaired. (Tr. 502, 503) Dr. Mahawar reported that Williams could not crouch, but could occasionally climb, stoop, kneel, and crawl and frequently balance. (Tr. 503) While Dr. Mahawar indicated that he examined Williams for 40 minutes, Williams' comments indicate that the exam lasted 15 minutes and that Dr.

Mahawar performed no tests that would evaluate her ability to
sit, stand, walk, or lift. (Tr. 506)

In a June 5, 2003 letter to Dr. Kim, Dr. Kenneth Ham of
Orthopaedic Associates of Munster stated that he had examined
Williams, who was "adamant that she does not want any injections
or surgeries." (Tr. 519) Dr. Ham noted his reluctance to pre-
scribe additional medications in lieu of considering cortisone
injections or surgery and suggested an MRI. (Tr. 519) An MRI was
conducted by Dr. Pankaj J. Patwari on June 10 which revealed
diffuse mild bulging between L4 and L5, "laterally causing mild
foraminal compromise," but indicating no disc herniation. (Tr.
508)

Williams' psychiatrist, Dr. Ozoa completed a psychiatric
evaluation of Williams on June 19, 2003 after having treated her
for approximately one month. (Tr. 511-517) Dr. Ozoa characterized
her diagnosis as major depression, single, and listed anhedonia,
appetite disturbance, and psychomotor agitation to retardation as
among her symptoms. (Tr. 513) Dr. Ozoa also noted marked or
extreme difficulty in concentration and indicated that she had
been prescribed Zoloft. (Tr. 513, 517)

Dr. Kim completed a lumbar spine RFC on June 30, 2003,
listing Williams' conditions as lumbrosacral radiculopathy,
hypertension, obesity, prolapsed uterus, diabetes, and depres-
sion. (Tr. 522-527) Dr. Kim indicated that Williams' pain inter-
fered with concentration either frequently or constantly. (Tr.
524) The doctor listed her prognosis as poor and indicated that

she could not sit or stand for more than five minutes at a time, and over the course of an eight-hour day, could not do so for more than a total of two hours. (Tr. 525) In response to a question asking how often Williams' impairments would cause her to be absent from work, Dr. Kim did not mark any of the answers provided, which included "more than four times a month," and instead wrote "many times." (Tr. 527)

On July 1, 2003, Dr. Ham reviewed the results of the June 10 MRI with Williams, whom he noted was in distress, shaking, tearful, and unable to sit still. (Tr. 521) Dr. Ham reviewed options with Williams that included non-narcotic medications, an epidural injection, and evaluation by a spine surgeon. (Tr. 521) Dr. Ham advised Williams to consult with the Pain Clinic and wrote a prescription for an epidural injection. (Tr. 521) Dr. K. Banayan performed a trigger point injection epidural on October 27, 2003, and indicated that Williams tolerated it well and demonstrated some initial pain relief. (Tr. 557)

Williams' second hearing before ALJ Wilkins was held on November 13, 2003. (Tr. 586) At the hearing, the ALJ again reviewed Williams' history and conditions as well as taking the testimony of Medical Expert Dr. William Newman. (Tr. 608) The ME testified that he "would disagree with a lot of what [consultative examiner Dr. Mahawar] said." (Tr. 617) Specifically, Dr. Newman stated that he would not find Williams capable of light work, and that, in contrast to an ability to lift 30 pounds, she could lift 10 pounds. (Tr. 617-618)  ALJ Wilkins presented the

14

Vocational Expert, Irvin Roth, with four hypotheticals. (Tr. 627-629) In the first, the ALJ described a 37-year old person with an 11th grade education, limited to unskilled light work, with no repetitive bending, stooping, crawling, or climbing, consisting of simple one-two-step, low concentration activities. (Tr. 627) VE Roth stated that there would be over 5,000 hand packer jobs, 5,000 inspector jobs, as well as over 10,000 assembler positions matching those characteristics. (Tr. 627) When the ALJ altered the hypothetical to reference unskilled sedentary work, the VE's response again included assemblers and hand packers, and approximately 2,000 electronics assembly jobs. (Tr. 628) In the next iteration of the hypothetical, ALJ Wilkin asked if allowing for a change of position at will would alter the previous results, and the VE stated that many of the prior jobs still could be performed with this condition. (Tr. 629) Finally, the VE stated that if the individual were unable to sustain eight hour days or a 40 hour week, no jobs would be available. (Tr. 629) In response to a question from Williams' counsel, the VE stated that a person suffering from urinary incontinence who left her workstation on an unscheduled basis eight times within a workday would not be able to maintain her employment. (Tr. 630)

In his written decision, ALJ Wilkin based his conclusion that Williams was not disabled on a combination of impairments including degenerative disc disease, obesity, diabetes, uterine prolapse, and depression. (Tr. 16) While the ALJ described Williams as "generally credible," he also found that her allega-

15

tions were "not totally credible." (Tr. 21) The ALJ concluded
that Williams did not "attest to pain and restrictions so signif-
icant as to preclude all forms of work activity."  (Tr. 17) The
ALJ noted that Williams' urinary frequency was "the only pur-
ported symptom that might conceivably preclude the claimant from
competitive, remunerative work activity." (Tr. 17) However, he
found that this condition was noted in the record as only a
slight problem. (Tr. 17) The ALJ further noted that Dr. Arthur
indicated that Williams' incontinence would not cause her to miss
work and that Williams did not raise this condition during her
consultative exam with Dr. Mahawar. (Tr. 17)

The ALJ recognized that Dr. Kim, as Williams' primary care
physician, was entitled to serious consideration, but he found
Dr. Kim's conclusions unsupported and disproportionate to the
record. (Tr. 18) The ALJ found Dr. Kim's evidence to be largely
based upon Williams' subjective complaints rather than "positive
objective signs" in the record. (Tr. 18) In support of this con-
clusion, ALJ Wilkins noted that MRIs of Williams' back indicated
only mild impairments. (Tr. 18)  The ALJ found further support
for this conclusion in the "largely unremarkable" consultative
exam performed by Dr. Mahawar. (Tr. 18)

The ALJ determined that Williams retained the capacity to
lift a maximum of 10 pounds and occasionally carry items weighing
less. (Tr. 21) ALJ Wilkin further limited Williams to work of
simple one and two-step tasks requiring low concentration but not
requiring repetitive bending, stooping, crawling, or climbing.

16

(Tr. 21) Based upon these limitations, the ALJ concluded that jobs in the regional economy that Williams could perform included over 4,000 as an inspector, 10,000 as an assembler, and 5,000 as a handpacker. (Tr. 21)

Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive.");  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting Consolidated Edison Company v. NRLB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)).  *See also Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  *Rice v. Barnhart*, 384 F.3d 363, 368-369 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues."  *Lopez*, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that she is unable

> to engage in any substantial gainful activity by reason of any medically determinable phys- ical or mental impairment which can be ex- pected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

> 42 U.S.C. §423(d)(1)(A)

The Social Security regulations enumerate the five-step sequen- tial evaluation to be followed when determining whether a claim- ant has met the burden of establishing disability.  20 C.F.R. §404.1520.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §404.1520(b).  If she is, the claimant is not disabled and the evaluation process is over; if she is not, the ALJ next addresses whether the claimant has a severe impairment or combi- nation of impairments which "significantly limits . . . physical or mental ability to do basic work activities."  20 C.F.R. §404.1520(c).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regula- tions.  20 C.F.R. §401, pt. 404, subpt. P, app. 1.  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" (RFC) and the physical and mental demands of her past work.  If, at this fourth step,

18

the claimant can perform her past relevant work, she will be found not disabled.  20 C.F.R. §404.1520(e).  However, if the claimant shows that her impairment is so severe that she is un-able to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f).

Williams contends that ALJ Wilkin improperly failed to give controlling weight to the evidence from treating physicians Kim, Arthur and Ozoa.  A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. §404.1527(d)(2).  *See also Gudgell v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 1996).  The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) *(quoting Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)), *See also* 20 C.F.R. §404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opin-ion.").

Internal inconsistencies in a treating physician's opinion may provide a good reason to deny it controlling weight. 20 C.F.R. §404.1527(c)(2); *Clifford*, 227 F.3d at 871. Furthermore, controlling weight need not be given when a physician's opinions are inconsistent with his treatment notes or are contradicted by substantial evidence in the record, including the claimant's own testimony. *See e.g. Latkowski v. Barnhart*, 93 Fed. Appx. 963, 970-71 (7th Cir. 2004); *Jacoby v. Barnhart*, 93 Fed. Appx. 939, 942 (7th Cir. 2004).  Ultimately, the weight accorded a treating physician's opinion must balance all the circumstances, with recognition that, while a treating physician "has spent more time with the claimant," the treating physician also may "bend over backwards to assist a patient in obtaining benefits . . . [and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)(internal citations omitted).

The ALJ's consideration of Dr. Kim's evaluations does not indicate the reasoning that led to the conclusion that Dr. Kim's assessment is not entitled to greater consideration. The ALJ stated that "some of the restrictions" described by Dr. Kim are disproportionate. The ALJ claimed that Dr. Kim's conclusions were not based on objective evidence, failing to recognize Dr. Kim's references to the MRI's of Williams' back condition, prolapsed uterus, and obesity. Instead, the ALJ noted that two of the MRIs indicated only "mild" bulging of the disc and foraminal compro-

20

mise. However, in relying so heavily on the term "mild" in these
two instances, the ALJ provided no indication that he considered
this evidence in conjunction with Williams' obesity, her own
consistent rating of pain at a 9 or 10 on a 10 point scale, the
consultative exam performed by Dr. Odeluga, Williams' history of
physical therapy treatment, significant evidence from Dr. Svetic,
Dr. Kanuru's reference to Williams' "extremely limited" spine
flexibility and tenderness, and finally, the extensive history of
Williams' use of pain medication documented in the record.

    Instead, the ALJ relied almost exclusively on the consulta-
tive exam performed by Dr. Mahawar. Though not entirely clear,
the record indicates that this exam may have been cursory at
best. More significantly, the ALJ made no attempt to reconcile
this evidence with the testifying medical expert's statement that
he disagreed with "most of what [Dr. Mahawar] said." (Tr. 617)
The ALJ, in fact, did limit Williams' RFC, however, the ALJ has
left the court with no ability to determine whether it accurately
reflects the record.

    The ALJ discounted the "bladder problem" residual function
questionnaire completed by Dr. Arthur with a comparable lack of
clarity. The ALJ first cited to an indication in the record that
this condition is only "slight." This reference, however, is
simply an entry on a form filled out when Williams was admitted
for an epidural steroid injection. Nonetheless, the ALJ improp-
erly treated this single line as reasoned medical opinion. The
ALJ further discounted Williams' incontinence by noting that her

treating physician, Dr. Arthur, stated that she would not "miss
any work" due to the condition. (Tr. 17) This selective approach
to the evidence elevated one statement in Dr. Arthur's RFC
questionnaire at the expense of the balance of its conclusions.
Dr. Arthur stated that Williams would not miss entire working
days solely as a result of her bladder condition. However, Dr.
Arthur also concluded that Williams' condition was severe enough
to interfere with her attention and concentration frequently,
that she required a job which provides ready access to a rest-
room, that she would need to take unscheduled restroom breaks
hourly for a period of five minutes each, and that once a day she
would be required to clean up and change clothes. These charac-
teristics were not included within the ALJ's RFC determination.
Based upon the hearing transcript, there is some indication that
the ALJ may have thought this condition was, if not under con-
trol, at least controllable. The medical expert testified at one
point that he did not believe this condition could be considered
a significant impairment. (Tr. 631) Later the ME inconclusively
speculated that, if she still was experiencing the problem, her
doctors may "have reservations as to performing surgery" to
correct it. (Tr. 633)

    Finally, the ALJ concluded that Williams' incontinence was
not necessary to consider because she did not mention it during
the consultative exam with Dr. Mahawar. The record contains
significant reference to this condition, including a specific
"bladder problem" RFC, and the failure of Williams to raise her

incontinence during the course of what may have been an entirely cursory physical capacity exam does not alleviate the ALJ's obligation to consider this condition. *See **Golembiewski v. Barnhart***, 322 F.3d 912, 917 (7th Cir. 2003)("Incontinence constitutes an impairment under the Social Security Act that must be considered to determine whether an applicant is disabled.").

Williams further faults the ALJ for not giving greater weight to the psychiatrist, Dr. Ozoa, as a treating physician. The ALJ's consideration of Dr. Ozoa, however, is supported by substantial evidence. First, its is not readily apparent that Dr. Ozoa is a "treating physician" as defined in the regulations. *See* 20 C.F.R. §1502 ("Generally, we will consider that you have an on-going treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the sources with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical conditions.") It appears that Dr. Ozoa treated Williams only once.  Dr. Ozoa completed Williams' psychological RFC one month after he began a treatment relationship with her, indicating that he treated her once a month. In addition, the RFC he completed leaves a number of questions blank and lists "getting along with family" and "concentration" as areas in which Williams experiences "marked or extreme" difficulties. Notably, one of the questions left blank by Dr. Ozoa asked whether Williams' condition lasted, or can be expected to last, at least 12 months. The record indicated that Williams had been prescribed

antidepressants by medical doctors including Dr. Kim, however, Williams has not presented an argument to show why the ALJ's RFC determination, which limited Williams to one and two-step jobs requiring a low degree of concentration, did not reflect accurately the extent of any depressive conditions.

Williams also attacks the ALJ's conclusion that she was less than credible.  The ALJ must determine Williams' credibility only after considering all of her symptoms "and the extent to which [her] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §404.1529(a).  If the symptoms she described were not supported by the objective medical evidence, "the ALJ must obtain detailed descriptions of [Williams'] daily activities by directing specific inquiries" about the symptoms and their effect on her. **Clifford**, 227 F.3d at 871 (*quoting **Luna v. Shalala**,* 22 F.3d 687, 691 (7th Cir. 1994)).  However, the ALJ "need not totally accept or totally reject [Williams'] statements." SSR 96-7p, at *4. Rather, the ALJ can make a determination, based on the totality of the evidence, that her statements are only credible to a certain degree. SSR 96-7p, at *4.

The ALJ must make more than "a single, conclusory statement . . .  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and

24

the reasons for that weight." SSR 96-7p, at *2. *See* ***Zurawski v. Halter***, 245 F.3d 881, 887 (7th Cir. 2001); ***Diaz v. Chater***, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. ***Steele v. Barnhart***, 290 F.3d 936, 942 (7th Cir. 2002).

In his decision, the ALJ described Williams as "generally credible," then later found her allegations "not totally credible for the reasons set forth in the body of the decision." (Tr. 21) The ALJ stated little within the decision that shed light on the apparent conclusion that Williams was only partially credible. Williams testified to numerous medical conditions, including diabetes, hypertension, uterine prolapse, incontinence, severe radiculating back pain, numbness in her legs, depression, anemia, and fatigue. Williams further testified as to the effect of these conditions on her ability to work and function in daily life. Williams stated that she was assisted by her mother and children in daily activities, that she no longer shopped, had not driven for approximately five months prior to the hearing, and had fallen a number of times due to her leg condition. At the hearing, Williams testified that the last time she drove she almost had an accident and had to pull over until her leg pain subsided. (Tr. 603) The ALJ's statement that Williams "drives an automobile and can do simple household chores as long as she does not have

to bend" was not supported by Williams' testimony. The ALJ's single statement that she was generally less than credible in no way qualifies as an explicit statement explaining why he mis-characterized  Williams' testimony.

Finally, Williams argues that the ALJ did not consider the effect of missed days on Williams' ability to work, her experi-ence of incontinence and uterine prolapse, lack of concentration and fatigue, and psychiatric problems. These brief arguments largely replicate the primary challenges to the ALJ's decision already discussed, or are presented with no development or citation to authority. Accordingly, they are not addressed beyond the discussion already provided.

_____

For the foregoing reasons, the Motion for Summary Judgment filed by the plaintiff, Yolanda Williams, on January 30, 2006, is **GRANTED**.

ENTERED this 12th day of October, 2006


                    s/ ANDREW P. RODOVICH
                       United States Magistrate Judge